*FILED*

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

*10 MAR -2 PM 12: 03*

*CLERK, U.S. DISTRICT COURT*
*MIDDLE DISTRICT OF FLORIDA*
*TAMPA, FLORIDA*

**UNITED STATES OF AMERICA,**
**ex rel. SCOTT T. KELLEY, M.D.,**

    Plaintiff,

v.

    Case No. 8:10 cv 549-T 30
    TBM

**GENZYME CORPORATION,**

    Defendant.

_____/

**Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2) Do Not Place In Press Box or Enter on Publicly Accessible System**

## FALSE CLAIMS ACT COMPLAINT
## AND DEMAND FOR JURY TRIAL

    1.    Relator, Scott T. Kelley, M.D. ("Relator"), brings this action on behalf of the United States of America against Defendant Genzyme Corporation for treble damages and civil penalties for its violations of the False Claims Act, 31 U.S.C. §3729, *et seq.*

    2.    As required by the False Claims Act, 31 U.S.C. §3730(b)(2), following the filing of this action the Relator will provide to the Attorney General of the United States and to the United States Attorney for the Middle District of Florida a statement of all material evidence and information related to the complaint. This disclosure statement is supported by material evidence known to the Relator to establish the existence of Genzyme's false claims. Because the disclosure statement includes attorney-client communications and work-product of Relator's attorney, and is submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in the litigation, the Relator understands this disclosure to be confidential.

T-
$350.-

## Jurisdiction and Venue

3.      This action arises under the False Claims Act, 31 U.S.C. §3729, *et seq*.  This

Court has subject matter jurisdiction over these causes of action pursuant to 28 U.S.C. §1331; 28

U.S.C. §1345; and 31 U.S.C. §3732(a).

4.      Venue is proper in the Tampa Division of the United States District Court for the

Middle District of Florida pursuant to 31 U.S.C. §3732(a) because some of the acts proscribed by

31 U.S.C. §3729, and of which complaint is made, took place in hospitals located in the Middle

District of Florida.  Venue in this District is also proper pursuant to 28 U.S.C.S. §1391(b) and (c)

because at all relevant times the Defendant engaged in and transacted business in the Middle

District of Florida, and as well as on a nationwide basis.

5.      All conditions precedent to the filing and maintenance of this action have been

performed or have occurred.

## Parties

6.      Relator was at all material times herein and currently is a medical doctor and

surgeon who is licensed to practice medicine by the State of Florida.  Relator is a paid expert

speaker by Genzyme and has personally been instructed by the agents and representatives of

Genzyme in an attempt to help them market Seprafilm, a trademarked product manufactured by

Genzyme.  In addition, Relator has used Genzyme's Seprafilm in surgery procedures he has

performed on patients in the past.  Relator has personal knowledge of and experience with

various types of illegal actions and activities of Genzyme concerning the marketing and

promotion of product Seprafilm as outlined in detail in the following paragraphs of this

Complaint.

7.     Defendant Genzyme Corporation is a publicly traded biotechnology company based in Cambridge, Massachusetts. Its Genzyme Biosurgery division manufactures and markets Seprafilm, a chemically modified sodium hyaluronate/carboxymethylcellulose absorbable solid adhesion barrier approved for use by the Food and Drug Administration ("FDA") which, when applied to a patient's internal organs following surgery, but before closure of the surgical incision, serves to prevent tissue adhesions following surgery. Seprafilm is manufactured and distributed in a solid state form comprised of a membrane housed in a sterile Procedure Pack. A true copy of the outside packaging appearance of a Procedure Pack is attached as **Exhibit A**.

## The Defendant's Scheme to Defraud Medicaid

8.     Seprafilm in its FDA approved state appears as a thin membrane of material which can effectively be applied following surgery, and before closure of the surgical incision, to the outer surface of the organs inside the human body following surgery when the patient's internal organs have exposed through a traditional surgical incision through the outer skin and tissue of the abdomen or back.

9.     Developments in the techniques, procedures and equipment available to perform surgery without the necessity of a large surgical incision which would expose the patient's internal organs (referred to on occasion as "open belly" procedures), through the use of minimally invasive techniques using a laparoscope and associated laparoscopic instruments, have caused a decrease in the number of surgical procedures where Seprafilm can be used to prevent surgical adhesions because in its membrane form the film cannot be effectively applied to the surface of a patient's internal organs laparoscopically. The decrease in the number of traditional or "open belly" surgical procedures in favor of the less-invasive techniques available,

and the corresponding increase in the number of laparoscopic procedures, threatened to diminish the demand for Seprafilm when used in its FDA-approved form.

10.     In order to increase the demand for Seprafilm beginning in or about 2002 Genzyme engaged in a nationwide scheme to promote and sell the use of Seprafilm in a semi-liquid or viscous gel state known as "slurry" to doctors and healthcare providers throughout the medical community. Taking FDA-approved products such as Seprafilm and modifying the products in ways that are not approved by the FDA is referred to as "off-label" use and such use is not allowed by the FDA. The marketing schemes employed by Genzyme to promote and sell the "off-label" use of Seprafilm known as "slurry," consist of the promotion and marketing of Seprafilm for indications other than those approved by the FDA knowing that the product so purchased with be submitted for reimbursement by the Medicare and Medicaid programs, as described below.

11.     The Medicare and Medicaid programs will reimburse expenses incurred by hospitals and clinics only for approved products and truthful claims made with respect to the care and treatment provided to patients covered by those programs. The unapproved modification of an FDA approved product for an indication not specified or approved is referred to as "off-label" use. As the result of the actions of Genzyme as outlined herein, significant off-label uses of Seprafilm, which uses are not covered or allowed to be reimbursed by Medicare or Medicaid, and which cause adverse effects to the patient in instances where the off-label use occurs, were included and billed for as covered charges by the hospitals in their costs reports that were submitted periodically for reimbursement to the hospital by Medicare or Medicaid, and which Medicare or Medicaid in fact paid.

12.     Genzyme knew of the adverse effects occasioned by the use of "slurry" and not only did not report the occurrence of the adverse effects described herein, but continued to promote Seprafilm for off-label use in the "slurry" form.  In fact, Seprafilm can have adverse effects upon a patient even when used in its FDA-approved form, but those adverse effects become even more problematic when the "slurry" form is employed in laparoscopic surgery because of the potential for the substance to flow to and around the location of the sutures and inhibit the healing.  For example, a study from the Department of General Surgery of Wenzhou Medical College in China reported in the World Journal of Surgery published in November of 2007 concluded that while "Seprafilm could decrease abdominal adhesions after general surgery, which may benefit patients, . . . [a]t the same time, Seprafilm did increase abdominal abscesses and anatomotic leaks."  A true copy of Efficacy and safety of Seprafilm for preventing postoperative abdominal adhesion: systematic review and meta-analysis is attached as **Exhibit B**. Also, a study from the Division of Gynecology, Department of Surgery at Memorial Sloan-Kettering Cancer Center reported in the Journal of Gynecologic Oncology published in November 2009 concluded that in patients undergoing laparotomy for ovarian, fallopian tube or primary peritoneal malignancies that Seprafilm "appears to be associated with a higher rate of postoperative intra-abdominal collections."  A true copy of Postoperative intra-abdominal collections using sodium hyaluronate-carboxymethylcellulose (HA-CMC) barrier at the time of laparotomy for ovarian, fallopian tube, or primary peritoneal cancers" is attached as **Exhibit C**.

13.     Relator used the FDA approved form of Seprafilm as an overlay of the patient's organ before closing the patient's abdomen in an attempt to minimize the adhesions that might occur between the organ and the anterior abdominal wall.  This was primarily because Relator's surgical practice often calls for subsequent surgery on the same patient years later and it is of

assistance to that subsequent surgery to prevent adhesions which would make the later surgery more difficult.

14.    The sales representatives of Genzyme introduced and promoted the use of the "slurry" to Relator on those occasions when he was performing laparoscopic surgery instead of the "open belly" procedure.  The sales representatives went so far as to instruct the operating room technicians and nurses in the method to prepare the "slurry" in a bowl in the operating room.  When the concept of using the "slurry" was introduced, Relator inquired of Genzyme sales representatives concerning the safety and efficacy of Seprafilm used as a "slurry."  He was told that its use was and would be safe and effective.  The sales representatives did not disclose the fact that the use of Seprafilm as a "slurry" in laparoscopic surgery was off-label, or that it caused or contributed to adverse effects realized by the patients involved.  Relator only used Seprafilm "slurry" on a few occasions in laparoscopic surgery procedures as the result of the encouragement of the sales representatives, but ceased using it once he realized that such use was not pursuant to the FDA approved label.

15.    Following Relator's decision to refuse to use the "slurry" mixture of Seprafilm in laparoscopic surgeries, he began to be aware of discussions between and among other physicians about the existence of adverse effects that might be occasioned by, or attributable to, the use of the "slurry" form of Seprafilm by other surgeons.  Relator determined that it was appropriate to proceed to make the government aware of these adverse effects because the sales representatives were not making the physicians aware of these facts.

16.    Genzyme through its sales representatives made false statements, which it knew were false, and would result in false claims for off-label uses being submitted to Medicare or other federal and state payors by hospitals and clinics purchasing Seprafilm from Genzyme, as

6

well as the likely occurrence of adverse effects to the patients which would necessitate incurring additional expenses to address and attempt to remedy the adverse effects experienced.

17.    These off-label promotion and marketing schemes of Genzyme caused Seprafilm to be used for and billed to Medicare for a multitude of off-label uses including, but not limited to:

a)   Gynecological off-label uses: (1) Laparoscopic hysterectomy ("TAH"), (2) Laparoscopic bilateral/unilateral salpingo oopherectomy ("BSO"), (3) Laparoscopic removal of pelvic mass, (4) Laparoscopic pelvic and periaortic lymph node dissection ("PPLND"), (5) Laparoscopic omentectomy, (6) Laparoscopic lysis of adhesions, (7) Laparoscopic myomectomy, (8) Laparoscopic tubal ligation, and (9) Exploratory Laparoscopy;

b)   Robotic Gynecologic off-label uses (robotic surgery is a type of laparoscopy) such as: (10) Robotic hysterectomy, (11) Robotic Bilateral/unilateral salpingo oopherectomy, (12) Robotic removal of pelvic mass, (13) Robotic pelvic and periaortic lymph dissection, (14) Robotic omentectomy, (15) Robotic lysis of adhesions, (16) Robotic myomecomy, and (17) Robotic Diagnostic Laparoscopy

c)   General/Colorectal Surgery off-label uses such as: (18) Laparoscopic hernia repair, (19) Laparoscopic cholecystectomy, (20) Laparoscopic lower anterior resection, (21) Laparoscopic lysis of adhesions, (22) Laparoscopic, hand assisted liver resection, (23) Laparoscopic left/right hemi-colectomy, (24) Laparoscopic transverse colectomy, and (25) Laparoscopic sigmoid resection; and Urologic off-label uses such as: (26) Robotic prostatectomy.

18.     As a result of Genzyme's off-label promotion and marketing schemes, Seprafilm was used for many unauthorized and unsafe indications, other than the FDA approved indications, some of which are as identified in paragraph 17 above and in instances where adverse effects were experienced by the patients because of the interaction between the "slurry" and the areas of the patient's body which were inhibited from healing due to the presence of the "slurry" in the vicinity of the surgical repair.

19.     The use of Seprafilm for unauthorized and unsafe indications as the result of off-label use makes Seprafilm ineligible to be charged by the user for reimbursement from Medicare, or other federal and state payors, and also causes the patients to be further injured by the occurrence of adverse consequences following the use of "slurry" at the site of a surgical procedure.

20.     As described in the preceding paragraphs, Genzyme caused hospitals nationwide to purchase Seprafilm for off-label and non-reimbursable indications. These off-label uses in turn were electronically recorded on the hospital's UB Form. The information and the claims contained on the UB Form is then used to determine outlier payments, the cost-to-charge ratio, patient reimbursement based on the DRG assigned (Medicare Part A), patient reimbursement under Medicare Part B, which is paid based on individual charges, and in the cost reports. The inclusion of a non-reimbursable expense has wide-ranging implication in the Medicare and Medicaid reimbursement structure as described herein.

21.     Genzyme since at least December of 2002 has promoted and marketed the use of Seprafilm for indications other than those approved by the FDA even though this practice was and is illegal.

22. Genzyme continues to train and encourage, both overtly and covertly, its Seprafilm sales representatives to market Seprafilm in the "slurry" form for off-label uses. Relator has been encouraged by new sales representatives for Genzyme to consider using the "slurry" made by modifying Seprafilm.

23. Knowing the FDA strictly prohibits off-label promotion, Genzyme still continues to train its sales representatives to promote and sell "slurry" (the off-label use of Seprafilm) to physicians, hospitals and other healthcare providers for both unapproved and unsafe uses.

24. Because Genzyme promoted off-label uses and concealed potential adverse effects, this caused patients to suffer from adverse effects such as, as but not limited to, abscesses and leakages, especially when used for colon surgery or hysterectomy surgery.

25. The Seprafilm was designed to prevent tissues from sticking together inside the abdomen, creating adhesions between the organs and the anterior abdominal wall. In some colorectal surgery a section of the bowel is removed and the surgeon is required to reattach the two adjoining sections of the bowel surgically. In hysterectomy surgery, the surgeon is removing the uterus where it connects to the vagina, and attempting to close what is referred to as the vaginal cuff—what had been the opening between the vagina and the uterus. In both instances the effort is to have the sutured tissue connect and heal so that there is no leakage.

26. The use of "slurry" when such surgery is done laparoscopically can operate to impede the ability of the tissue to stick together and heal because the "slurry" mix can migrate and coat the surface of the part of the body where the sutures or staples have been placed to assist in the healing process, and by so doing serve to prevent the very healing that is desired because of the ability of the Seprafilm to inhibit the adhesions in other instances. This allows the opportunity for leaking stool product out of the bowel into the abdominal cavity surrounding the

bowel, or leaking of peritoneal fluid out of the peritoneum into the vagina and discharged from there.

27.     The leaking caused or contributed to by the use of "slurry" can lead to infection in the peritoneum, sepsis (infection in the blood) or other infections occurring in the vagina as the result of the presence of discharge.

28.     These adverse effects in turn have caused more tests and exams to have to be performed, and prolonged patient stays in the hospitals. In the instance of a leak in the colon following colorectal surgery, the existence of a leak can necessitate the insertion of a drain with CAT scan guidance, along with the extended treatment of the patient with antibiotics to eliminate the infection resulting from the leak. Often the existence of such leaks can necessitate new surgery to rectify the problem, and a diversion of the fecal stream using the colostomy procedure for either temporary or permanent discharge and elimination of the fecal stream.

29.     The leaks and adverse effects caused by the off-label use of Seprafilm has caused patients to have to be readmitted and possibly have to go through another surgical procedure to repair the leaks caused by the off-label use of Seprafilm. On occasion, the adverse effects suffered by patients undergoing surgery followed by the use of the "slurry" might ultimately include the death of the patient as a result of the infections caused or contributed to by the use of the off-label "slurry."

30.     The results of the additional tests and examinations, prolonged patient stays in the hospital, readmissions following initial discharge and additional surgical procedures to correct the adverse effects are additional expenses incurred by the patient and the hospital, and additional billings to Medicare and other federal and state payors.

### Payments of Kickbacks to Physicians
### to Induce Use of Seprafilm and "Slurry"

31.     Genzyme also encouraged, overtly or covertly, its Seprafilm sales representatives to provide items of value to physicians and others in order to induce sales of both Seprafilm and "slurry." These included grants of money and other items of value for physicians, nurses and others who were in a position to influence the purchase of Seprafilm.

32.     These acts violated the Anti-Kickback Act, 42 U.S.C. §1320a-7b and in turn generated false claims under the False Claims Act.

33.     Defendant paid excessive fees to speakers to encourage their continued use and promotion of Seprafilm for unapproved indications.

34.     Genzyme entered into a Seprafilm Speaker Services Agreement ("Speaker Agreement") on an annual basis with various physicians and surgeons for the purpose of setting up a structure for the payment of the excessive fees to encourage their continued use and promotion of Seprafilm.  A true copy of the Seprafilm Speakers Services Agreement dated February 19, 2009 between Genzyme and Relator is attached as **Exhibit D**.

35.     Although the ostensible purpose of the Speaker Agreement was to compensate the contracting party for speaking at scientific events, surgical skills workshops, lecture tours, seminars, symposia, congresses, educational programs and the like, as requested and coordinated by Genzyme's speaker bureau administrator, it began to occur that Relator was often invited to attend functions for the purpose of "speaking" under the Speaker Agreement when the only persons in attendance were the sales representative and Relator, and the meeting was at a restaurant for dinner.  The sales representative would host the dinner for Relator, and on occasion his guests, pick up the costs of the dinner and within a few days arrange for Relator to be sent a check for $1,000 from Genzyme.  The check would be for $2,000 if the occasion for the

"speaking" engagement was a dinner that took place outside of the west central Florida area. On the occasions when Relator was simply invited for dinner with the sales representative under the auspices of the Speaker Agreement there was no presentation by Relator—just a dinner and the subsequent payment for attending the free dinner.

36.     Relator was encouraged by the sales representatives to use the Seprafilm product, both in FDA-approved form and in the "slurry" form at these "speaking engagement" dinners, but he declined to use the "slurry" because in his opinion it was not effective and it was not consistent with the FDA approved label. Now that it appears that the "speaking engagement" was merely an effort to justify the payment of money to Relator without there being a legitimate educational program involved, Relator has concluded that such activity was an attempt to provide a justification for making payments that were not otherwise appropriate.

37.     Relator believes, based on his discussions with the sales representatives who arranged for and attended his "speaking engagement" dinners, that Genzyme has paid hundreds of physicians with checks in thousand dollar increments, and has paid for expensive, lavish dinner parties at fine restaurants simply to promote and induce the use and sales of Seprafilm and "slurry."

38.     Although Genzyme invites doctors to get paid to be a "speaker" to promote its product, no content for the presentation has to be reviewed or approved in advance because in most instances there is no presentation given.

39.     The "speaker" fees and the extravagant dinners were a method to attempt to induce additional uses and sales of Seprafilm by physicians, although Relator clearly advised the sales representatives that these dinners and the speaker fees should carry with them no expectation on their part that Relator would change his surgical methods or otherwise increase

the use and purchase of Seprafilm. Despite these admonitions, the sales representatives still tried to induce Relator to modify his practices to use more Seprafilm by stating that many surgeons were cooperating with Genzyme's expectations and were successfully induced to use more Seprafilm as a result of the compensation method devised by Genzyme.

40.     Relator has been informed by the sales representatives for Genzyme that other representatives conduct this type of solicitation all over the nation.

41.     It now appears that Genzyme paid these high volume doctors and disguised such payments as "honoraria" in order to induce these doctors to get hospitals to purchase Genzyme's products. Genzyme's sales representatives reported that the attendance at the dinner meetings included physicians who did not attend in order to attempt to justify the supposed "educational" purpose of the meeting when in fact the purpose was to arrange for indirect compensation.

42.     Genzyme proceeds in this fashion because it has found that it pays to have these doctors to promote its products to other doctors in the medical community.

43.     This kickback strategy is paid for through the Genzyme's "medical education department" instead of through the Defendant's sales representatives' budget so that Genzyme can circumvent CMS guidelines.

44.     These disguised "speakers" never had to follow any protocol or instructions as "speakers." Instead, Genzyme simply induced these physicians by paying them to encourage the sale of both Seprafilm and "slurry" as well as to invite other physicians to assist in promoting the use of Seprafilm and the "slurry" derived from it by other physicians.

45.     This kickback strategy worked, thereby increasing the sales of Seprafilm and "slurry" in the medical community.

46.     Genzyme would give checks to physicians as a kickback for promoting both Seprafilm and "slurry" to use, and for basically encouraging their peers and other members of the medical community to purchase Seprafilm product.

47.     These so called "educational" dinners are disguises for Genzyme's kickbacks (through checks and expensive meals) to induce physicians to promote the purchase of Seprafilm and "slurry."

48.     Over a period of time Relator received checks from Genzyme more or less on a monthly basis in the typical amount of $1,000.  A true copy of one of the cover letters and a check stub from Genzyme for a payment made in April 2009 is attached as **Exhibit E.**

### Count 1: Causing to Be Presented False and
### Fraudulent Claims in Violation of 31 U.S.C. §3729(a)(1)(A)

49.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 48 as if they were fully set forth herein.

50.     From at least December 2002 through the present, Defendant knowingly caused to be presented false and fraudulent Medicare claims for payment or approval in violation of 31 U.S.C. §3729(a)(1)(A) by: (1) causing hospitals to include non-covered costs for Seprafilm used for indications other than what is indicated on the FDA-approved label in cost reports submitted under the Medicare Part A program; and (2) causing hospitals to seek reimbursement for the non-covered costs for Seprafilm used for indications other that what is indicated on the FDA-approved label when those purchases of Seprafilm were obtained by payment of remuneration in violation of the Anti-Kickback Act.

### Count 2:  Making False Statements to Get False and
### Fraudulent Claims Paid in Violation of 31 U.S.C. §3729(a)(2)

51.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 48 as if they were fully set forth herein..

52.     From at least December 2002 through the present, Defendant knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States by falsely telling physicians that the off-label use of "slurry" was safe and medically effective.

53.     By virtue of the false and fraudulent claims made by Defendant, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### Count 3:  Conspiracy to Defraud
### in Violation of 31 U.S.C. §3729(a)(3)

54.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 48 as if they were fully set forth herein.

55.     From at least December 2002 through the present, Defendant knowingly conspired with its employees and with physicians to defraud the United States by getting false or fraudulent claims allowed or paid by the United States

56.     By virtue of the false and fraudulent claims made by Defendant, the United States suffered damages and therefore is entitled to multiple damages under the Federal False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### Medicaid State Programs

### Count 4:  Presenting and Causing to Be Presented False Claims
### In Violation of California False Claims Act, California Government Code §12651

57.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 48 as if they were fully set forth herein.

58.     California Government Code § 12651 provides that any person who knowingly presents or causes to be presented a false claim for payment or approval to an officer or employee of the state or a political subdivision is liable for treble damages and a civil penalty of up to $10,000 for each false claim.

59.     From at least December 2002 through the present, Defendant knowingly caused to be presented false and fraudulent claims for payment or approval to the California Medicaid Program in violation of California Government Code 12651 by: (1) causing hospitals to include non-covered costs for Seprafilm used for indications other than what is indicated on the FDA-approved label in cost reports submitted under the Medicare Part A program; and (2) causing hospitals to seek reimbursement for the non-covered costs for Seprafilm used for indications other that what is indicated on the FDA-approved label when those purchases of Seprafilm were obtained by payment of remuneration in violation of the Anti-Kickback Act

60.     From at least December 2002 through the present, Defendant knowingly conspired with its employees and with other physicians to defraud the California Medicaid Program by getting false or fraudulent claims allowed or paid by the California Medicaid Program in violation of California Government Code 12651.

61.     From at least December 2002 through the present, Defendant knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the California Medicaid program by falsely telling physicians that the off-label use of "slurry" was safe and medically effective in violation of California Government Code 12651.

**Count 5:  Presenting and Causing to Be Presented False Claims
In Violation of Delaware False Claims and Reporting Act,
Title 6, Delaware Code, Section 1201**

62.     Relator realleges and incorporates by reference the allegations contained in
paragraphs 1 through 48 as if they were fully set forth herein.

63.     The Delaware False Claims and Reporting Act, Title 6, Delaware Code, Section
1201 provides that any person who knowingly presents or causes to be presented a false or
fraudulent claim to an officer or employee of the state government is liable for treble damages
and a civil penalty of $5,500-$11,000 for each such act.

64.     From at least December 2002 through the present, Defendant knowingly caused to
be presented false and fraudulent claims for payment or approval in violation of Delaware False
Claims and Reporting Act, Title 6, Delaware Code, Section 1201 by: (1) causing hospitals to
include non-covered costs for Seprafilm used for indications other than what is indicated on the
FDA-approved label in cost reports submitted under the Medicare Part A program; and (2)
causing hospitals to seek reimbursement for the non-covered costs for Seprafilm used for
indications other that what is indicated on the FDA-approved label when those purchases of
Seprafilm were obtained by payment of remuneration in violation of the Anti-Kickback Act.

65.     From at least December 2002 through the present, Defendant knowingly
conspired with its employees and with physicians to defraud the United States by getting false or
fraudulent claims allowed or paid by the Delaware Medicaid Program in violation of Delaware
False Claims and Reporting Act, Title 6, Delaware Code, Section 1201.

66.     From at least December 2002 through the present, Defendant knowingly made,
used, or caused to be made or used, false records or statements to get false or fraudulent claims
paid or approved by the Delaware Medicaid program by falsely telling physicians that the off-

17

label use of "slurry" was safe and medically effective in violation of Delaware False Claims and

Reporting Act, Title 6, Delaware Code, Section 1201

### Count 6:  Presenting and Causing to Be Presented False Claims
### In Violation of The District of Columbia False Claims Act,
### District of Columbia Statutes §2-308.14

67.     Relator realleges and incorporates by reference the allegations contained in

paragraphs 1 through 48 as if they were fully set forth herein.

68.     The District of Columbia False Claims Act, District of Columbia Statutes §2-

308.14, provides that any person who knowingly presents or causes to be presented a false claim

for payment or approval to an officer or employee of the District is liable for treble damages and

a civil penalty of $5,000-$10,000 for each false claim.

69.     From at least December 2002 through the present, Defendant knowingly caused to

be presented false and fraudulent claims for payment or approval in violation of District of

Columbia False Claims Act, District of Columbia Statutes § 2-308.14 by: (1) causing hospitals to

include non-covered costs for Seprafilm used for indications other than what is indicated on the

FDA-approved label in cost reports submitted under the Medicare Part A program; and (2)

causing hospitals to seek reimbursement for the non-covered costs for Seprafilm used for

indications other that what is indicated on the FDA-approved label when those purchases of

Seprafilm were obtained by payment of remuneration in violation of the Anti-Kickback Act.

70.     From at least December 2002 through the present, Defendant knowingly

conspired with its employees and with physicians to defraud the United States by getting false or

fraudulent claims allowed or paid by the District of Columbia False Claims Act, District of

Columbia Statutes §2-308.14.

71.     From at least December 2002 through the present, Defendant knowingly made,

used, or caused to be made or used, false records or statements to get false or fraudulent claims

paid or approved by the District of Columbia Medicaid program by falsely telling physicians that the off-label use of "slurry" was safe and medically effective in violation of District of Columbia False Claims Act, District of Columbia Statutes §2-308.14.

### Count 7: Presenting and Causing to Be Presented False Claims In Violation of Florida False Claims Act, Florida Statutes §68.081-68.09

72.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 48 as if they were fully set forth herein.

73.     The Florida False Claims Act, Florida Statutes §68.081-68.09, provides that any person who knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

74.     From at least December 2002 through the present, Defendant knowingly caused to be presented false and fraudulent claims for payment or approval in violation of Florida False Claims Act, Florida Statutes §68.081-68.09 by: (1) causing hospitals to include non-covered costs for Seprafilm used for indications other than what is indicated on the FDA-approved label in cost reports submitted under the Medicare Part A program; and (2) causing hospitals to seek reimbursement for the non-covered costs for Seprafilm used for indications other that what is indicated on the FDA-approved label when those purchases of Seprafilm were obtained by payment of remuneration in violation of the Anti-Kickback Act.

75.     From at least December 2002 through the present, Defendant knowingly conspired with its employees and with physicians to defraud the United States by getting false or fraudulent claims allowed or paid by the Florida False Claims Act, Florida Statutes §68.081-68.09.

76.     From at least December 2002 through the present, Defendant knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Florida Medicaid program by falsely telling physicians that the off-label use of "slurry" was safe and medically effective in violation of Florida False Claims Act, Florida Statutes § 68.081-68.09.

### Count 8:  Presenting and Causing to Be Presented False Claims
### In Violation of Georgia State False Medicaid Claims Act, 49 Georgia Code, Chapter 4

77.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 48 as if they were fully set forth herein.

78.     The Georgia State False Medicaid Claims Act, 49 Georgia Code, Chapter 4, provides that any person who knowingly presents or causes to be presented a false or fraudulent claim to the Georgia Medicaid program is liable for treble damages and a civil penalty of $5,500-$11,000 for each false or fraudulent claim.

79.     From at least December 2002 through the present, Defendant knowingly caused to be presented false and fraudulent claims for payment or approval in violation of Georgia State False Medicaid Claims Act, 49 Georgia Code, Chapter 4 by: (1) causing hospitals to include non-covered costs for Seprafilm used for indications other than what is indicated on the FDA-approved label in cost reports submitted under the Medicare Part A program; and (2) causing hospitals to seek reimbursement for the non-covered costs for Seprafilm used for indications other that what is indicated on the FDA-approved label when those purchases of Seprafilm were obtained by payment of remuneration in violation of the Anti-Kickback Act.

80.     From at least December 2002 through the present, Defendant knowingly conspired with its employees and with physicians to defraud the United States by getting false or

fraudulent claims allowed or paid by the Georgia Medicaid Program in violation of Georgia State False Medicaid Claims Act, 49 Georgia Code, Chapter 4.

81.     From at least December 2002 through the present, Defendant knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program by falsely telling physicians that the off-label use of "slurry" was safe and medically effective in violation of Georgia State False Medicaid Claims Act, 49 Georgia Code, Chapter 4.


### Count 9:  Presenting and Causing to Be Presented False Claims
### In Violation of Hawaii False Claims Act, Hawaii Revised Statutes Section 661-21

82.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 48 as if they were fully set forth herein.

83.     The Hawaii False Claims Act, Hawaii Revised Statutes Section 661-21, provides that any person who knowingly presents or causes to be presented a false or fraudulent claim to an officer or employee of the state is liable for treble damages and a civil penalty of $5,000-$10,000.

84.     From at least December 2002 through the present, Defendant knowingly caused to be presented false and fraudulent claims for payment or approval in violation of Hawaii False Claims Act, Hawaii Revised Statutes Section 661-21 by: (1) causing hospitals to include non-covered costs for Seprafilm used for indications other than what is indicated on the FDA-approved label in cost reports submitted under the Medicare Part A program; and (2) causing hospitals to seek reimbursement for the non-covered costs for Seprafilm used for indications other that what is indicated on the FDA-approved label when those purchases of Seprafilm were obtained by payment of remuneration in violation of the Anti-Kickback Act.

85.     From at least December 2002 through the present, Defendant knowingly conspired with its employees and with physicians to defraud the United States by getting false or fraudulent claims allowed or paid by the Hawaii Medicaid Program in violation of Hawaii False Claims Act, Hawaii Revised Statutes Section 661-21.

86.     From at least December 2002 through the present, Defendant knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Hawaii Medicaid program by falsely telling physicians that the off-label use of "slurry" was safe and medically effective in violation of Hawaii False Claims Act, Hawaii Revised Statutes Section 661-21.

### Count 10:  Presenting and Causing to Be Presented False Claims In Violation of Illinois Whistleblower Reward and Protection Act, 740 Illinois Compiled Statutes Annotated, Section 175/3

87.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 48 as if they were fully set forth herein.

88.     The Illinois Whistleblower Reward and Protection Act, 740 Illinois Compiled Statutes Annotated, Section 175/3 provides that any person who knowingly presents or causes to be presented a false or fraudulent claim to an employee or officer of the state for payment or approval is liable for treble damages and a civil penalty of $5,000-$10,000.

89.     From at least December 2002 through the present, Defendant knowingly caused to be presented false and fraudulent claims for payment or approval in violation of Illinois Whistleblower Reward and Protection Act, 740 Illinois Compiled Statutes Annotated, Section 175/3 by: (1) causing hospitals to include non-covered costs for Seprafilm used for indications other than what is indicated on the FDA-approved label in cost reports submitted under the Medicare Part A program; and (2) causing hospitals to seek reimbursement for the non-covered costs for Seprafilm used for indications other that what is indicated on the FDA-approved label

when those purchases of Seprafilm were obtained by payment of remuneration in violation of the Anti-Kickback Act.

90.     From at least December 2002 through the present, Defendant knowingly conspired with its employees and with physicians to defraud the United States by getting false or fraudulent claims allowed or paid by the Illinois Whistleblower Reward and Protection Act, 740 Illinois Compiled Statutes Annotated, Section 175/3.

91.     From at least December 2002 through the present, Defendant knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Illinois Medicaid program by falsely telling physicians that the off-label use of "slurry" was safe and medically effective in violation of Illinois Whistleblower Reward and Protection Act, 740 Illinois Compiled Statutes Annotated, Section 175/3.

### Count 11:  Presenting and Causing to Be Presented False Claims In Violation of Indiana False Claims and Whistleblower Protection Act, Indiana Code §5-11-5.5

92.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 48 as if they were fully set forth herein.

93.     The Indiana False Claims and Whistleblower Protection Act, Indiana Code §5-11-5.5, provides that any person who knowingly or intentionally presents a false claim to the state for payment or approval is liable for treble damages and a civil penalty of at least $5,000.

94.     From at least December 2002 through the present, Defendant knowingly caused to be presented false and fraudulent claims for payment or approval in violation of Indiana False Claims and Whistleblower Protection Act, Indiana Code §5-11-5.5 by: (1) causing hospitals to include non-covered costs for Seprafilm used for indications other than what is indicated on the FDA-approved label in cost reports submitted under the Medicare Part A program; and (2) causing hospitals to seek reimbursement for the non-covered costs for Seprafilm used for

indications other that what is indicated on the FDA-approved label when those purchases of

Seprafilm were obtained by payment of remuneration in violation of the Anti-Kickback Act.

95.     From at least December 2002 through the present, Defendant knowingly

conspired with its employees and with physicians to defraud the United States by getting false or

fraudulent claims allowed or paid by the Indiana False Claims and Whistleblower Protection Act,

Indiana Code §5-11-5.5.

96.     From at least December 2002 through the present, Defendant knowingly made,

used, or caused to be made or used, false records or statements to get false or fraudulent claims

paid or approved by the Indiana Medicaid program by falsely telling physicians that the off-label

use of "slurry" was safe and medically effective in violation of Indiana False Claims and

Whistleblower Protection Act, Indiana Code §5-11-5.5.

### Count 12:  Presenting and Causing to Be Presented False Claims
### In Violation of Louisiana Medical Assistance Programs Integrity Law,
### Louisiana Revised Statutes Annotated Section 46:439.1

97.     Relator realleges and incorporates by reference the allegations contained in

paragraphs 1 through 48 as if they were fully set forth herein.

98.     The Louisiana Medical Assistance Programs Integrity Law, Louisiana Revised

Statutes Annotated Section 46:439.1, provides that any person who knowingly presents or causes

to be presented a false or fraudulent claim against medical assistance funds for payment is liable

for a civil fine not to exceed three times the amount of actual damages sustained by the medical

assistance program.

99.     From at least December 2002 through the present, Defendant knowingly caused to

be presented false and fraudulent claims for payment or approval in violation of Louisiana

Medical Assistance Programs Integrity Law, Louisiana Revised Statutes Annotated Section

46:439.1 by: (1) causing hospitals to include non-covered costs for Seprafilm used for

indications other than what is indicated on the FDA-approved label in cost reports submitted

under the Medicare Part A program; and (2) causing hospitals to seek reimbursement for the

non-covered costs for Seprafilm used for indications other that what is indicated on the FDA-

approved label when those purchases of Seprafilm were obtained by payment of remuneration in

violation of the Anti-Kickback Act.

100.    From at least December 2002 through the present, Defendant knowingly

conspired with its employees and with physicians to defraud the United States by getting false or

fraudulent claims allowed or paid by the Louisiana Medical Assistance Programs Integrity Law,

Louisiana Revised Statutes Annotated Section 46:439.1.

101.    From at least December 2002 through the present, Defendant knowingly made,

used, or caused to be made or used, false records or statements to get false or fraudulent claims

paid or approved by the Louisiana Medicaid program by falsely telling physicians that the off-

label use of "slurry" was safe and medically effective in violation of Louisiana Medical

Assistance Programs Integrity Law, Louisiana Revised Statutes Annotated Section 46:439.1.

### Count 13:  Presenting and Causing to Be Presented False Claims
### In Violation of Massachusetts False Claims Act,
### Massachusetts Annotated Laws Chapter 12, Section 5B

102.    Relator realleges and incorporates by reference the allegations contained in

paragraphs 1 through 48 as if they were fully set forth herein.

103.    The Massachusetts False Claims Act, Massachusetts Annotated Laws Chapter 12,

Section 5B, provides that any person who knowingly presents or causes to be presented a false or

fraudulent claim for payment or approval to an employee, agent or representative of the

Commonwealth is liable for treble damages and a civil penalty of not less than $5,000 and not

more than $10,000 per violation.

104.    From at least December 2002 through the present, Defendant knowingly caused to be presented false and fraudulent claims for payment or approval in violation of Massachusetts False Claims Act, Massachusetts Annotated Laws Chapter 12, Section 5B by: (1) causing hospitals to include non-covered costs for Seprafilm used for indications other than what is indicated on the FDA-approved label in cost reports submitted under the Medicare Part A program; and (2) causing hospitals to seek reimbursement for the non-covered costs for Seprafilm used for indications other that what is indicated on the FDA-approved label when those purchases of Seprafilm were obtained by payment of remuneration in violation of the Anti-Kickback Act.

105.    From at least December 2002 through the present, Defendant knowingly conspired with its employees and with physicians to defraud the United States by getting false or fraudulent claims allowed or paid by the Massachusetts False Claims Act, Massachusetts Annotated Laws Chapter 12, Section 5B.

106.    From at least December 2002 through the present, Defendant knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Massachusetts Medicaid program by falsely telling physicians that the off-label use of "slurry" was safe and medically effective in violation of Massachusetts False Claims Act, Massachusetts Annotated Laws Chapter 12, Section 5B.

### Count 14:  Presenting and Causing to Be Presented False Claims
### In Violation of Michigan Medicaid False Claim Act,
### Michigan Compiled Laws §§400.607, 400.610a, and 400.612

107.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 48 as if they were fully set forth herein.

108.    The Michigan Medicaid False Claim Act, Michigan Compiled Laws §§400.607, 400.610a, and 400.612, provides that any person who makes or presents or causes to be

presented a claim to the Michigan Medicaid program knowing it is false is liable for the full amount received plus treble the amount of damages suffered by the state.

109.    From at least December 2002 through the present, Defendant knowingly caused to be presented false and fraudulent claims for payment or approval in violation of Michigan Medicaid False Claim Act, Michigan Compiled Laws §§400.607, 400.610a, and 400.612 by: (1) causing hospitals to include non-covered costs for Seprafilm used for indications other than what is indicated on the FDA-approved label in cost reports submitted under the Medicare Part A program; and (2) causing hospitals to seek reimbursement for the non-covered costs for Seprafilm used for indications other that what is indicated on the FDA-approved label when those purchases of Seprafilm were obtained by payment of remuneration in violation of the Anti-Kickback Act.

110.    From at least December 2002 through the present, Defendant knowingly conspired with its employees and with physicians to defraud the United States by getting false or fraudulent claims allowed or paid by the Michigan Medicaid False Claim Act, Michigan Compiled Laws §§400.607, 400.610a, and 400.612.

111.    From at least December 2002 through the present, Defendant knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Michigan Medicaid program by falsely telling physicians that the off-label use of "slurry" was safe and medically effective in violation of Michigan Medicaid False Claim Act, Michigan Compiled Laws §§400.607, 400.610a, and 400.612.

### Count 15:  Presenting and Causing to Be Presented False Claims
### In Violation of Montana False Claims Act, Montana Code Chapter 465

112.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 48 as if they were fully set forth herein.

113.     The Montana False Claims Act, Montana Code Chapter 465, provides that any person who makes or causes to be made a false claim for payment or approval to a Montana governmental entity and causes damage of more than $500 is liable for from double to treble damages and a civil penalty of up to $10,000 for each act.

114.     From at least December 2002 through the present, Defendant knowingly caused to be presented false and fraudulent claims for payment or approval in violation of Montana False Claims Act, Montana Code Chapter 465 by: (1) causing hospitals to include non-covered costs for Seprafilm used for indications other than what is indicated on the FDA-approved label in cost reports submitted under the Medicare Part A program; and (2) causing hospitals to seek reimbursement for the non-covered costs for Seprafilm used for indications other that what is indicated on the FDA-approved label when those purchases of Seprafilm were obtained by payment of remuneration in violation of the Anti-Kickback Act.

115.     From at least December 2002 through the present, Defendant knowingly conspired with its employees and with physicians to defraud the United States by getting false or fraudulent claims allowed or paid by the Montana False Claims Act, Montana Code Chapter 465.

116.     From at least December 2002 through the present, Defendant knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Montana Medicaid program by falsely telling physicians that the off-label use of "slurry" was safe and medically effective in violation of Montana False Claims Act, Montana Code Chapter 465.

### Count 16:  Presenting and Causing to Be Presented False Claims In Violation of Nevada Revised Statutes §357.040

117.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 48 as if they were fully set forth herein.

118.    Nevada Revised Statutes §357.040 provides that any person who knowingly presents or causes to be presented a false claim for payment or approval to a state officer, employee or agent is liable for treble damages and a civil penalty of not less than $2,000 nor more than $10,000 for each act.

119.    From at least December 2002 through the present, Defendant knowingly caused to be presented false and fraudulent claims for payment or approval in violation of Nevada Revised Statutes §357.040 by: (1) causing hospitals to include non-covered costs for Seprafilm used for indications other than what is indicated on the FDA-approved label in cost reports submitted under the Medicare Part A program; and (2) causing hospitals to seek reimbursement for the non-covered costs for Seprafilm used for indications other that what is indicated on the FDA-approved label when those purchases of Seprafilm were obtained by payment of remuneration in violation of the Anti-Kickback Act.

120.    From at least December 2002 through the present, Defendant knowingly conspired with its employees and with physicians to defraud the United States by getting false or fraudulent claims allowed or paid by the Nevada Revised Statutes §357.040.

121.    From at least December 2002 through the present, Defendant knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Nevada Medicaid program by falsely telling physicians that the off-label use of "slurry" was safe and medically effective in violation of Nevada Revised Statutes § 357.040.

### Count 17:  Presenting and Causing to Be Presented False Claims
### In Violation of New Hampshire Revised Statutes §167:61-b

122.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 48 as if they were fully set forth herein.

123.    New Hampshire Revised Statutes §167:61-b provides that any person who knowingly presents or causes to be presented a false or fraudulent claim to a state officer or employee is liable for treble damages and a civil penalty of not less than $5,000 nor more than $10,000.

124.    From at least December 2002 through the present, Defendant knowingly caused to be presented false and fraudulent claims for payment or approval in violation of New Hampshire Revised Statutes §167:61-b by: (1) causing hospitals to include non-covered costs for Seprafilm used for indications other than what is indicated on the FDA-approved label in cost reports submitted under the Medicare Part A program; and (2) causing hospitals to seek reimbursement for the non-covered costs for Seprafilm used for indications other that what is indicated on the FDA-approved label when those purchases of Seprafilm were obtained by payment of remuneration in violation of the Anti-Kickback Act.

125.    From at least December 2002 through the present, Defendant knowingly conspired with its employees and with physicians to defraud the United States by getting false or fraudulent claims allowed or paid by the New Hampshire Revised Statutes §167:61-b.

126.    From at least December 2002 through the present, Defendant knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the New Hampshire Medicaid program by falsely telling physicians that the off-label use of "slurry" was safe and medically effective in violation of New Hampshire Revised Statutes §167:61-b.

### Count 18:  Presenting and Causing to Be Presented False Claims
### In Violation of New Jersey False Claims Act, New Jersey Statutes Annotated §2A:32C-3

127.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 48 as if they were fully set forth herein.

128.    The New Jersey False Claims Act, New Jersey Statutes Annotated §2A:32C-3, provides that any person who knowingly presents or causes to be presented a false claim for payment or approval to a state officer, employee, agent, or contractor is liable for treble damages and a civil penalty of between $5500 and $11,000.

129.    From at least December 2002 through the present, Defendant knowingly caused to be presented false and fraudulent claims for payment or approval in violation of New Jersey False Claims Act, New Jersey Statutes Annotated §2A:32C-3 by: (1) causing hospitals to include non-covered costs for Seprafilm used for indications other than what is indicated on the FDA-approved label in cost reports submitted under the Medicare Part A program; and (2) causing hospitals to seek reimbursement for the non-covered costs for Seprafilm used for indications other that what is indicated on the FDA-approved label when those purchases of Seprafilm were obtained by payment of remuneration in violation of the Anti-Kickback Act.

130.    From at least December 2002 through the present, Defendant knowingly conspired with its employees and with physicians to defraud the United States by getting false or fraudulent claims allowed or paid by the New Jersey False Claims Act, New Jersey Statutes Annotated §2A:32C-3.

131.    From at least December 2002 through the present, Defendant knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the New Jersey Medicaid program by falsely telling physicians that the off-label use of "slurry" was safe and medically effective in violation of New Jersey False Claims Act, New Jersey Statutes Annotated §2A:32C-3.

31

## Count 19:  Presenting and Causing to Be Presented False Claims
### In Violation of New Mexico Medicaid False Claims Act,
### New Mexico Statutes Annotated §27-14-4

132.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 48 as if they were fully set forth herein.

133.    The New Mexico Medicaid False Claims Act, New Mexico Statutes Annotated §27-14-4, provides that any person who knowingly presents or causes to be presented a false or fraudulent Medicaid claim for payment to the state is liable for treble damages.

134.    From at least December 2002 through the present, Defendant knowingly caused to be presented false and fraudulent claims for payment or approval in violation of New Mexico Medicaid False Claims Act, New Mexico Statutes Annotated §27-14-4 by: (1) causing hospitals to include non-covered costs for Seprafilm used for indications other than what is indicated on the FDA-approved label in cost reports submitted under the Medicare Part A program; and (2) causing hospitals to seek reimbursement for the non-covered costs for Seprafilm used for indications other that what is indicated on the FDA-approved label when those purchases of Seprafilm were obtained by payment of remuneration in violation of the Anti-Kickback Act.

135.    From at least December 2002 through the present, Defendant knowingly conspired with its employees and with physicians to defraud the United States by getting false or fraudulent claims allowed or paid by the New Mexico Medicaid False Claims Act, New Mexico Statutes Annotated §27-14-4.

136.    From at least December 2002 through the present, Defendant knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the New Mexico Medicaid program by falsely telling physicians that the

32

off-label use of "slurry" was safe and medically effective in violation of New Mexico Medicaid

False Claims Act, New Mexico Statutes Annotated §27-14-4.

### Count 20:  Presenting and Causing to Be Presented False Claims
### In Violation of New York State False Claims Act, \
### McKinney's State Finance Law §189

137.    Relator realleges and incorporates by reference the allegations contained in

paragraphs 1 through 48 as if they were fully set forth herein.

138.    The New York State False Claims Act, McKinney's State Finance Law §189,

provides that any person who knowingly presents or causes to be presented a false or fraudulent

claim for payment or approval to an employee, officer or agent of the state is liable for treble

damages and a civil penalty of $6,000.00-$12,000.00.

139.    From at least December 2002 through the present, Defendant knowingly caused to

be presented false and fraudulent claims for payment or approval in violation of New York State

False Claims Act, McKinney's State Finance Law §189 by: (1) causing hospitals to include non-

covered costs for Seprafilm used for indications other than what is indicated on the FDA-

approved label in cost reports submitted under the Medicare Part A program; and (2) causing

hospitals to seek reimbursement for the non-covered costs for Seprafilm used for indications

other that what is indicated on the FDA-approved label when those purchases of Seprafilm were

obtained by payment of remuneration in violation of the Anti-Kickback Act.

140.    From at least December 2002 through the present, Defendant knowingly

conspired with its employees and with physicians to defraud the United States by getting false or

fraudulent claims allowed or paid by the New York State False Claims Act, McKinney's State

Finance Law §189.

141.    From at least December 2002 through the present, Defendant knowingly made,

used, or caused to be made or used, false records or statements to get false or fraudulent claims

33

paid or approved by the New York Medicaid program by falsely telling physicians that the off-label use of "slurry" was safe and medically effective in violation of New York State False Claims Act, McKinney's State Finance Law §189.

### Count 21:  Presenting and Causing to Be Presented False Claims
### In Violation of Oklahoma Medicaid False Claims Act,
### 63 Oklahoma Statutes Annotated §5053.1

142.   Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 48 as if they were fully set forth herein.

143.   The Oklahoma Medicaid False Claims Act, 63 Oklahoma Statutes Annotated §5053.1, provides that any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval to a state officer or employee is liable for treble damages and a civil penalty of $5,000-$10,000.

144.   From at least December 2002 through the present, Defendant knowingly caused to be presented false and fraudulent claims for payment or approval in violation of Oklahoma Medicaid False Claims Act, 63 Oklahoma Statutes Annotated §5053.1 by: (1) causing hospitals to include non-covered costs for Seprafilm used for indications other than what is indicated on the FDA-approved label in cost reports submitted under the Medicare Part A program; and (2) causing hospitals to seek reimbursement for the non-covered costs for Seprafilm used for indications other that what is indicated on the FDA-approved label when those purchases of Seprafilm were obtained by payment of remuneration in violation of the Anti-Kickback Act.

145.   From at least December 2002 through the present, Defendant knowingly conspired with its employees and with physicians to defraud the United States by getting false or fraudulent claims allowed or paid by the Oklahoma Medicaid False Claims Act, 63 Oklahoma Statutes Annotated §5053.1.

34

146.    From at least December 2002 through the present, Defendant knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Oklahoma Medicaid program by falsely telling physicians that the off-label use of "slurry" was safe and medically effective in violation of Oklahoma Medicaid False Claims Act, 63 Oklahoma Statutes Annotated §5053.1.

### Count 22:  Presenting and Causing to Be Presented False Claims In Violation of Rhode Island State False Claim Act, Rhode Island Statutes §9-1.1-3

147.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 48 as if they were fully set forth herein.

148.    The Rhode Island State False Claim Act, Rhode Island Statutes §9-1.1-3, provides that any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval to a state officer or employee is liable for treble damages and a civil penalty of $5,000-$10,000.

149.    From at least December 2002 through the present, Defendant knowingly caused to be presented false and fraudulent claims for payment or approval in violation of Rhode Island State False Claim Act, Rhode Island Statutes §9-1.1-3 by: (1) causing hospitals to include non-covered costs for Seprafilm used for indications other than what is indicated on the FDA-approved label in cost reports submitted under the Medicare Part A program; and (2) causing hospitals to seek reimbursement for the non-covered costs for Seprafilm used for indications other that what is indicated on the FDA-approved label when those purchases of Seprafilm were obtained by payment of remuneration in violation of the Anti-Kickback Act.

150.    From at least December 2002 through the present, Defendant knowingly conspired with its employees and with physicians to defraud the United States by getting false or

fraudulent claims allowed or paid by the Rhode Island State False Claim Act, Rhode Island Statutes §9-1.1-3.

151.    From at least December 2002 through the present, Defendant knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Rhode Island Medicaid program by falsely telling physicians that the off-label use of "slurry" was safe and medically effective in violation of Rhode Island State False Claim Act, Rhode Island Statutes §9-1.1-3.

**Count 22:  Presenting and Causing to Be Presented False Claims
In Violation of Tennessee False Claims Act,
Tennessee Code Annotated §4-18-103**

152.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 48 as if they were fully set forth herein.

153.    The Tennessee False Claims Act, Tennessee Code Annotated §4-18-103, provides that any person who knowingly presents or causes to be presented a false claim for payment or approval to a state officer or employee is liable for treble damages and a civil penalty of $2,500-$10,000 for each false claim.

154.    From at least December 2002 through the present, Defendant knowingly caused to be presented false and fraudulent claims for payment or approval in violation of Tennessee False Claims Act, Tennessee Code Annotated §4-18-103 by: (1) causing hospitals to include non-covered costs for Seprafilm used for indications other than what is indicated on the FDA-approved label in cost reports submitted under the Medicare Part A program; and (2) causing hospitals to seek reimbursement for the non-covered costs for Seprafilm used for indications other that what is indicated on the FDA-approved label when those purchases of Seprafilm were obtained by payment of remuneration in violation of the Anti-Kickback Act.

36

155.   From at least December 2002 through the present, Defendant knowingly

conspired with its employees and with physicians to defraud the United States by getting false or

fraudulent claims allowed or paid by the Tennessee False Claims Act, Tennessee Code

Annotated §4-18-103.

156.   From at least December 2002 through the present, Defendant knowingly made,

used, or caused to be made or used, false records or statements to get false or fraudulent claims

paid or approved by the Tennessee Medicaid program by falsely telling physicians that the off-

label use of "slurry" was safe and medically effective in violation of Tennessee False Claims

Act, Tennessee Code Annotated §4-18-103.

### Count 23:  Presenting and Causing to Be Presented False Claims
### In Violation of Texas False Claims Act,
### Texas Human Resources Code §32.039

157.   Relator realleges and incorporates by reference the allegations contained in

paragraphs 1 through 48 as if they were fully set forth herein.

158.   The Texas False Claims Act, Texas Human Resources Code §32.039, provides

that any person who knowingly presents or causes to be presented a false Medicaid claim for

payment is liable for treble damages and a civil penalty of not more than $10,000 for each

violation.

159.   From at least December 2002 through the present, Defendant knowingly caused to

be presented false and fraudulent claims for payment or approval in violation of Texas False

Claims Act, Texas Human Resources Code §32.039 by: (1) causing hospitals to include non-

covered costs for Seprafilm used for indications other than what is indicated on the FDA-

approved label in cost reports submitted under the Medicare Part A program; and (2) causing

hospitals to seek reimbursement for the non-covered costs for Seprafilm used for indications

other that what is indicated on the FDA-approved label when those purchases of Seprafilm were obtained by payment of remuneration in violation of the Anti-Kickback Act.

160.   From at least December 2002 through the present, Defendant knowingly conspired with its employees and with physicians to defraud the United States by getting false or fraudulent claims allowed or paid by the Texas False Claims Act, Texas Human Resources Code §32.039.

161.   From at least December 2002 through the present, Defendant knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Texas Medicaid program by falsely telling physicians that the off-label use of "slurry" was safe and medically effective in violation of Texas False Claims Act, Texas Human Resources Code §32.039.

### Count 24:  Presenting and Causing to Be Presented False Claims In Violation of the Virginia Fraud Against Taxpayers Act, Code of Virginia §8.01-216.3

162.   Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 48 as if they were fully set forth herein.

163.   The Virginia Fraud Against Taxpayers Act, Code of Virginia §8.01-216.3, provides that any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval to an officer or employee of the Commonwealth is liable for treble damages and a civil penalty of $5,000-$10,000.

164.   From at least December 2002 through the present, Defendant knowingly caused to be presented false and fraudulent claims for payment or approval in violation of Virginia Fraud Against Taxpayers Act, Code of Virginia §8.01-216.3 by: (1) causing hospitals to include non-covered costs for Seprafilm used for indications other than what is indicated on the FDA-approved label in cost reports submitted under the Medicare Part A program; and (2) causing

hospitals to seek reimbursement for the non-covered costs for Seprafilm used for indications

other that what is indicated on the FDA-approved label when those purchases of Seprafilm were

obtained by payment of remuneration in violation of the Anti-Kickback Act.

165.   From at least December 2002 through the present, Defendant knowingly

conspired with its employees and with physicians to defraud the United States by getting false or

fraudulent claims allowed or paid by the Virginia Fraud Against Taxpayers Act, Code of

Virginia §8.01-216.3.

166.   From at least December 2002 through the present, Defendant knowingly made,

used, or caused to be made or used, false records or statements to get false or fraudulent claims

paid or approved by the Virginia Medicaid program by falsely telling physicians that the off-

label use of "slurry" was safe and medically effective in violation of Virginia Fraud Against

Taxpayers Act, Code of Virginia §8.01-216.3.

### Count 25:  Presenting and Causing to Be Presented False Claims In Violation of the Wisconsin False Claims for Medical Assistance Act, Wisconsin Statutes §20.931

167.   Relator realleges and incorporates by reference the allegations contained in

paragraphs 1 through 48 as if they were fully set forth herein.

168.   The Wisconsin False Claims for Medical Assistance Act, Wisconsin Statutes §

20.931, provides that any person who knowingly presents or causes to be presented a false claim

for medical assistance to a state officer, employee or agent is liable for treble damages and a

forfeiture of $5,000-$10,000 for each violation.

169.   From at least December 2002 through the present, Defendant knowingly caused to

be presented false and fraudulent claims for payment or approval in violation of Wisconsin False

Claims for Medical Assistance Act, Wisconsin Statutes §20.931 by: (1) causing hospitals to

include non-covered costs for Seprafilm used for indications other than what is indicated on the

FDA-approved label in cost reports submitted under the Medicare Part A program; and (2) causing hospitals to seek reimbursement for the non-covered costs for Seprafilm used for indications other that what is indicated on the FDA-approved label when those purchases of Seprafilm were obtained by payment of remuneration in violation of the Anti-Kickback Act.

170. From at least December 2002 through the present, Defendant knowingly conspired with its employees and with physicians to defraud the United States by getting false or fraudulent claims allowed or paid by the Wisconsin False Claims for Medical Assistance Act, Wisconsin Statutes §20.931.

171. From at least December 2002 through the present, Defendant knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Wisconsin Medicaid program by falsely telling physicians that the off-label use of "slurry" was safe and medically effective in violation of Wisconsin False Claims for Medical Assistance Act, Wisconsin Statutes §20.931.

WHEREFORE, Relator respectfully requests this Court enter judgment against Defendant and order:

   a) That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false and fraudulent claims alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §3729, *et seq.* provides;

   b) That civil penalties of $11,000 be imposed for each and every false and fraudulent claim that Defendant presented to the United States;

   c) That pre and post-judgment interest be awarded, along with reasonable attorneys fees, costs and expenses which the Relator necessarily incurred in bringing and pressing this case;

   d) That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act violations for which redress is sought in this Complaint;

e) That the Relator be awarded the maximum amount allowed pursuant to the False Claims Act; and

f) That this Court award such other and further relief as it deems proper.

## Demand for Jury Trial

Relator, on behalf of himself and the United States, demands a jury trial on all claims alleged herein.

<div style="margin-left:40%">

ADDISON & HOWARD, P.A.
Post Office Box 172535
Tampa, Florida  33672-0535
Tel:  (813) 223-2000
Fax:  (813) 228-6000
Attorneys for Scott T. Kelley, M.D.


Michael C. Addison
Florida Bar No. 145579
m@mcalaw.net

</div>

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing False Claims Act Complaint and

Demand for Jury Trial was furnished by United States mail to the person(s) listed below on

March ___, 2010.

_____
Michael C. Addison

**A. Brian Albritton, Esq.**
**United States Attorney,**
United States Attorney's Office,
400 N. Tampa Street, Suite 3200,
Tampa, Florida 33602
By mail and hand delivery

**Eric Holder, Esq.**
**United States Attorney General,**
Department Of Justice,
950 Pennsylvania Avenue, N.W.,
Washington, D.C. 20530-001
By regular mail and *Certified Mail, Return
Receipt Requested*

**Civil Process Clerk,**
400 N. Tampa Street, Suite 3200,
Tampa, Florida 33602
By regular mail and *Certified Mail, Return
Receipt Requested*

s:\clients open\kelley scott.genzyme\draf\complaint - second march 1 draft 46484.doc