# sepra/film® Procedure Pack

## ADHESION BARRIER

| LOT | 07NP286 |
|---|---|
| EXP: | 2010-09 |

Chemically modified sodium hyaluronate/carboxymethylcellulose absorbable adhesion barrier

**Sterile**

Contents: Six (6) 3" x 5" (7 x 13 cm) membranes

Do not use if pouch is damaged or opened

Read instructions carefully before use

Store at 36-86° F (2 - 30° C)

For surgical use only

For single use only

Do not resterilize

Do not fold

Rx Only



Reorder No. **5086-02**

5605 (1/05)

Manufactured by:
Genzyme Biosurgery
A division of
GENZYME CORPORATION
500 Kendall Street
Cambridge, MA 02142 USA

**genzyme**


EXHIBIT
A

## SEPRAFILM SPEAKER SERVICES AGREEMENT

This SPEAKER SERVICES AGREEMENT (this "Agreement") dated February 19, 2009 (the "Effective Date") between Scott T. Kelley, M.D., located at:

("Speaker"), and Genzyme Corporation, a Massachusetts corporation having an office and principal place of business at 500 Kendall Street, Cambridge, Massachusetts 02142 ("Genzyme").

### WITNESSETH:

WHEREAS, Speaker has expertise in research for and treatment of patients undergoing surgical procedures in which there is a risk of adhesions (the "Medical Condition");

WHEREAS, Genzyme is a diversified human healthcare company engaged in the research, design, development, production and distribution of therapeutic, surgical, diagnostic, genetic and other medical products and services;

WHEREAS, Genzyme desires to engage physicians to become a member of its speaking program ("Speakers Bureau") who have expertise in the diagnosis and treatment of patients with the Medical Condition to speak at various educational forums and trainings; and

WHEREAS, Speaker is willing to become a member of the Speakers Bureau and provide speaker services to Genzyme with respect to speaking on the Medical Condition at various Genzyme sponsored, non-CME educational programs as requested by Genzyme and as coordinated by Genzyme's Speakers Bureau administrator ("Administrator").

NOW, THEREFORE, for good and valuable consideration, the sufficiency of which is acknowledged by the parties, the parties agree as follows:

1.    Speaker Services.

Genzyme hereby engages Speaker to provide Speaker Services (as hereafter defined) for Genzyme, upon Genzyme's request, at Genzyme sponsored, non-CME educational programs. As used herein, the term "Speaker Services" shall include, but not be limited to the following: providing Genzyme with your most recent Curriculum Vitae, providing a summary of your professional background and areas of scientific expertise, and a completed W-9 tax form; participating in training sessions (including compliance training) and reviewing training materials to become an authorized speaker; speaking at various scientific events, surgical skills training workshops, lecture tours, seminars, symposia, congresses, patient meetings, insurance provider meetings, educational



programs or at other similar forums as requested and coordinated by the Administrator; presenting each Engagement within a predetermined time, format, and content guidelines; representing Genzyme in a professional manner; and performing such other tasks that we reasonably request of you during the term of this Agreement.

2.    Compensation.

(a)    Speaker will be paid an honorarium in accordance with the schedule set forth in Exhibit A.

(b)    Genzyme shall reimburse Speaker for all reasonable and necessary travel, lodging, and meal expenses required and incurred in delivering the program. These expenses will require Genzyme's approval before being incurred, and will be approved and reimbursed pursuant to Genzyme's corporate policies for such expenses, as set forth in Exhibit C (which require, among other things, the submission of receipts or other verification of expenses). The Speaker shall utilize coach fares and early air travel scheduling, unless unavailable, in accordance with Genzyme's travel policy. Genzyme will not pay for upgrades or for any travel or subsistence expenses for spouses. Invoices and expensed are to be sent to: Sarah Nahom, Genzyme Biosurgery, 55 Cambridge Parkway, Cambridge, MA, 02142. Genzyme will provide such reimbursements thirty (30) days after submission of invoice.

(c)    Speaker represents and warrants that the honorarium set forth above constitutes fair market value for the Speaker Services.

3.    Confidentiality.

In order to carry out the Speaker Services, it may be necessary for Genzyme to disclose to Speaker certain information proprietary to Genzyme ("Confidential Information"). Speaker agrees not to use to his own or any other party's advantage or to disclose to any person or entity any Confidential Information, including but not limited to financial data, customer lists, projects, economic information, systems, plans, procedures, operations, techniques, patent applications, trade secrets, know-how, inventions, technical data or specifications, testing methods, research and development activities, marketing strategies or other information. The foregoing non-disclosure shall not apply to information that (i) is already in the possession of Speaker without obligation of confidentiality (as shown by written records not derived from Genzyme), (ii) was in the public domain at the time it was disclosed to Speaker or subsequent to disclosure becomes part of the public domain through no fault of Speaker, (iii) becomes known to Speaker without restriction from a source other than Genzyme without breach of this Agreement and otherwise not in violation of Genzyme's rights, or (iv) is disclosed pursuant to a requirement of a governmental body, provided, however, that Speaker shall provide prompt notice thereof to enable Genzyme to seek a protective order or otherwise prevent such disclosure. The confidentiality and non-use obligations set forth in this Section 3 will survive the expiration or any termination of this Agreement, and will continue for five (5) years after

2

Case 8:10-cv-00549-SDM-TBM   Document 1-2   Filed 03/02/10   Page 4 of 23 PageID 47

Apr 01 09 03:30p     Jose. O. Fuentes       305-93. 6262          p.3

the effective date of that expiration or termination.

4.    Assignment and Subcontracting.

Speaker may not assign this Agreement or subcontract its obligations hereunder to another person or entity without the express written permission of Genzyme.

5.    Term and Termination.

The term of this Agreement shall begin on the Effective Date and shall continue for a period of twelve (12) months unless terminated earlier as set forth below.  In the event of termination, Genzyme shall be relieved of all further obligations under this Agreement from and after the date of such termination.  Either party may terminate this Agreement for breach that is not cured within five (5) days of the provision of written notice of such breach.

6.    Publicity.

Speaker shall not originate any publicity, news release, or other public announcement, written or oral, whether to the public press or otherwise, relating to this Agreement, to any amendment hereto, or to performance hereunder without Genzyme's prior written consent.

7.    Presentation Materials.

To fulfill Genzyme's regulatory obligations, Genzyme recommends that Speaker use Genzyme originated or Genzyme approved materials during any Engagement in which Speaker discusses Genzyme product when providing Speaking Services in the United States.  Any non-Genzyme originated materials discussing Genzyme products shall conform to the guidelines set forth in the attached Exhibit B.  Genzyme recommends that Speaker submit any non-Genzyme originated materials discussing Genzyme products to Genzyme prior to providing Speaking Services for advice from Genzyme's Regulatory Department.  Speaker is under no obligation to promote, endorse or otherwise recommend Genzyme or Genzyme products during Engagements or at any other time. Engagement attendees should be informed that the Speaker is receiving compensation from Genzyme for providing Speaking Services.  In satisfying its regulatory obligations, Genzyme does not intend to control, direct or otherwise influence Speaker's medical judgment or medical discussions.

When providing Speaking Services outside of the United States, Speaker may consult with local counsel to determine applicable regulatory requirements.  Speaker's presentations shall conform with local regulatory requirements.

8.    Conflicting Obligations.

Speaker represents that he or she is under no obligation to any third party which would prevent Speaker from carrying out Speaker's duties and obligations under this Agreement

or which is inconsistent with the provisions contained herein. Speaker is responsible for ensuring that this Agreement is consistent with the patent, consulting, speaking engagement or other policies of Speaker's employer, and hereby represents to Genzyme that Speaker has determined that this Agreement complies with all of those policies.

9.    Non-Referral.

The parties agree that Speaker is under no obligation to solicit, refer or solicit referrals of patients for any Genzyme business. Speaker will not receive any benefit of any kind for making any referrals nor suffer any detriment for not making such referrals.

10.    Debarment.

Speaker represents and certifies that he or she has not been debarred by any relevant governmental or regulatory authority. Further, if Genzyme consents to Speaker's employment or engagement of any other person or entity to perform any Services under this Agreement, Speaker represents that he or she has no knowledge of such person or entity having been debarred.

11.    Notices.

Any notice required or permitted under this Agreement shall be in writing delivered personally or by facsimile (and promptly confirmed by personal delivery or courier) or courier, postage prepaid (where applicable), addressed to the other party at its address first indicated above, or to such other address as the addressee shall have last furnished in writing to the addressor and shall be effective upon receipt by the addressee.

12.    Governing Law.

This Agreement shall be governed by the laws of the Commonwealth of Massachusetts, without giving effect to the conflict or choice of law provisions thereof.

13.    Survivability.

If any part of this Agreement shall be held unenforceable, the remainder of the Agreement shall nevertheless remain in full, force, and effect and the unenforceable provision shall be construed by the court in such a manner as to be held enforceable while giving maximum effect to the intended meaning.

14.    Entire Agreement.

This Agreement represents the entire and integrated agreement between Genzyme and Speaker with respect to the subject matter hereof and supersedes and terminates all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both parties.

4

15.    <u>Counterparts</u>.

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first written above.

SPEAKER

Signature: _____

Name:   Scott T. Kelley, M.D.

GENZYME CORPORATION

Signature: _____

Name: C. Ann Merrifield

Title: President, Genzyme Biosurgery

ACKNOWLEDGED BY:

*(Please have a representative from your hospital review this Agreement and acknowledge below)*

Signature:_____

Name *(please print)*:_____

Title:_____

Institution:_____

## Exhibit A

Speaker shall be paid an honorarium based on the time that an engagement requires him/her to be out of the office or hospital, pursuant to the following tiers. For multiple commitments within one speaking engagement (i.e. an engagement that requires a commitment exceeding one full day), the Speaker shall be compensated for the accumulation of time out of the office or hospital, pursuant to the respective honoraria listed below. All approved speakers are eligible to speak within any tier.

Tier 1 Engagement:
Engagement requires up to 2 hours
Honorarium: $500

Tier 2 Engagement:
Engagement requires 2 - 5 hours
Honorarium $1,000

Tier 3 Engagement:
Engagement requires more than 5 hours, up to one full day
Honorarium: $2,000

7

## Exhibit B

*The US Food and Drug Administration's Guidance on Industry-Supported Scientific and Educational Activities distinguishes between those programs that are essentially independent of a company's influence and those that are performed by or on behalf of a company. Programs that are scheduled by Genzyme or for which Speakers are paid directly by Genzyme and that involve product discussion are subject to FDA promotion regulations, and Genzyme may be held responsible for such presentations. Accordingly, if your presentation may in any fashion include a discussion of products, you agree to observe the following guidelines.*

*In accordance with Genzyme's corporate policy on Advertising and Promotion of Medical Products (GQ-002-02) external communications materials discussing Genzyme's products must be in compliance with the U.S. FDA advertising and promotion regulations (21 CFR 202). Because of this, Genzyme recommends the use of company approved external communications materials.*

### What is considered "external communications materials"?

External communications materials: include, but are not limited to, any presentation or representation of Genzyme products, other than those materials formally approved by regulatory authorities (i.e., package insert, immediate container/carton labels), intended for distribution by any means (journals and other publications, Internet, direct-to-consumer), in any form (i.e. print, audio, visual, verbal communication), to disseminate information about those products. This includes all advertisements, promotional labeling, marketing and educational materials intended for distribution at trade shows, conferences and seminars. It also includes scripts; talking points or printed information provided in response to solicited inquiries through 1-800 numbers listed in promotional labeling or advertising. It also includes the presentation, publication, advertisement or announcement, of information, other than scientific data, pertaining to unapproved Genzyme products or Genzyme sponsored clinical trials.

*If individuals are contracted to create presentations or other external communications materials outside the company, these materials must adhere to the following:*

### Focus on the educational needs of the audience.

The focus of all presentations should be on the educational needs of the audience.

### Stay within the product's approved labeling.

Company sponsored educational activities do not enjoy the same exemptions as independent CME activities. These activities are subject to the advertising and promotion regulations. Products are deemed misbranded if promoted for an unapproved or off-label use. Individuals can not make any claims or implied statements regarding the safety or effectiveness of investigational products. An Individual's remarks must conform to the approved labeling for any product discussed. If in response to questions from the audience, individuals believe it is essential to discuss information that does not conform to approved labeling, they must emphasize that fact to the audience, to provide a brief response, and to promptly direct the discussion back to areas that conform to the approved labeling.

### Contain Fair Balance.

Under 21 CFR 202, Genzyme must provide balanced information about its products. Fair Balance is a requirement that applies to all types of promotional materials disseminated about specific products, including presentations/seminars, advertisements (both print & electronic), detailing pieces, and public relations materials. The content of presentation materials must contain true statements that adequately disclose the risks (including contraindications, warnings, precautions, adverse effects, etc.) and the benefits associated with the product.

A-1

### *Not be False or Misleading:*

The content of materials must not distort product information on the balance of risks and benefits being promoted. As such, individuals should avoid:

- Claims that a product is safer or more effective than the labeling indicates.

- Comparison claims with another product without any specific proof. Comparisons of safety or efficacy must only be based on adequate and well-controlled studies and must be based on the overall body of available data.

- Anecdotal evidence and unsupported opinion. This should not form a significant part of any presentation. Information presented on products must be based on a complete and accurate discussion of scientific methods generally accepted in the medical community.

- Misrepresentations of a study or other information pertaining to clinical data.

- Use of graphics in a misleading way.

Discussion of investigational new drugs/unapproved products.
Under FDA regulations, any person acting on behalf of Genzyme cannot represent in a promotional context that an investigational new drug is safe and effective – or otherwise promote an unapproved product. Medical Condition awareness is the only type of promotion available for unapproved products. Inquiries regarding any ongoing clinical trials for investigational new drugs should be directed to Genzyme's Medical Information department.

Acknowledgement of Genzyme's support.
Any role by Genzyme in the design of the program and its financial support of any presentation must be disclosed to the audience.

If materials/presentations are developed outside of Genzyme, there is help available to ensure compliance.
There is a resource within Genzyme's Regulatory Affairs Department called the External Communications Council (ECC). This group provides consistent regulatory guidance and approach regarding product labeling, advertising and promotional activities throughout Genzyme's Corporate Divisions. The ECC is available to review materials upon request.

A-2

## Exhibit C

### Expense Guidelines for Genzyme Consultants and Speakers
### January 2008

Genzyme's policy is to reimburse for actual, reasonable and proper business expenditures which are incurred while conducting authorized business for Genzyme and which meet U.S. Internal Revenue Service (IRS) regulations as well as any country or local regulations for business expense.

Advocacy Development Managers (Roland DeAngelis, Michael Simone, Tom Mayberger and Lynette Giovani) are responsible for ensuring that consultants who incur travel expenses are properly instructed on and comply with the rules in this policy. We trust consultants and speakers traveling on Genzyme business exercise good judgment to ensure that the expenditures incurred are reasonable, necessary, and in the best interests of Genzyme as well as to ensure the expenditures fall within the guidelines set forth in this policy.

### TRAVEL POLICY

1. Air Travel Guidelines/Reservations: All airline reservations for Genzyme consultants and speakers are to be made at the lowest logical airfare to travel at the lowest reasonable cost to the Company without consideration of personal gain. Whenever possible travelers should make reservations seven (7) to fourteen (14) days prior to travel in order to take advantage of advance purchase airfares. Booking higher airfares to accumulate mileage points is not permissible.
   a. Class of Service: All travelers must be booked in economy class except for International flights of six consecutive hours of flying time on the same flight. Please use the lowest logical airfare available at time of booking. Upgrades are allowed at the traveler's expense provided the fare paid by Genzyme does not increase in order to use the upgrade.
   b. Business Class Travel: Business Class travel is acceptable under the following rules:
      i. 'Red Eye' overnights and coast-to-coast flights are used when the traveler is reporting directly to or from performing his Genzyme contracted service to the airport and working a full (8 hour) day.
      ii. If the total flying time exceeds eight (8) consecutive hours on domestic flights and (6) consecutive hours on international flights.
      iii. Consultants and speakers with certain physical conditions/disabilities.

2. Hotel Policy: Genzyme's policy is to use moderately priced hotels and motels. Please attempt to obtain the best possible rates when you book your hotel.

3. Car Rental Policy: In the absence of special business requirements, please use a compact or intermediate sized car.

### REIMBURSEMENT POLICY

Genzyme consultants and speakers use the attached reporting form [Please conform with the form that Nancy Desrosiers team is currently using for consultants]. This can be submitted by mail, fax or email if you have e-signature capability. These should be sent to Andrea Crompton, Genzyme Biosurgery, 55 Cambridge Pkwy, Cambridge, MA 02142 Andrea.Crompton@genzyme.com ; fax 617.761.8789. Please

process expenses within 30 days of incursion. NOTE: Genzyme reserves the right NOT to reimburse any expenses that are submitted more than two (2) months from the date on which they were incurred.

1. Receipts: Genzyme requires receipts for all purchases costing $25.00 or more. All receipts must contain the following information:
   - Vendor Name
   - Vendor Location
   - Date of Purchase
   - Itemized listing of all items purchased with associated individual prices
   - Total cost of purchase

   All receipts must be included with the expense reports. Faxed or scanned copies are acceptable but please be sure to retain the original. If a receipt is missing or does not meet the standard set forth above, that expense will not be reimbursed by Genzyme. If a receipt is lost, it is the responsibility of the consultant or speaker to get a copy or duplicate of the receipt for reimbursement. Copies of credit card statements are not sufficient receipts and will not be accepted as proof of the expense.

2. Non-reimbursable Expenses: Genzyme's policy is to reimburse for actual, reasonable, and proper business expenditures which are incurred while conducting authorized business for Genzyme and which meets US Internal Revenue Service (IRS) regulations as well as other local and country-based regulations as a legitimate business expense. The following is a list of NON-REIMBURSABLE items that are considered personal in nature, are considered unreasonable or unnecessary or are not authorized as legitimate business expenses for submission on an expense report in accordance with US IRS regulations or other local or country-based regulations:
   - Airline, hotel or car rental upgrades that add incremental costs to travel.
   - Bank or ATM fees other than currency conversion fees.
   - Personal phone charges (mobile or home) usage service.
   - Internet connections – other than hotel-related connections.
   - Excess baggage charges (either number of bags or bag weight) unless directly related to official Genzyme business.
   - Insurance options of personal property or flight insurance.
   - Fines for traffic or parking violations or court costs.
   - Damage or theft of a personal vehicle while on Genzyme business.
   - Loss of personal funds or property while on Genzyme business, including lost luggage.
   - Duty charges on personal items or gifts.
   - Personal grooming including, but not limited to, barber/hair stylist fees, shoe shines, make-up, manicures, pedicures, and massages.
   - Spouse or non-contracted traveling companion expenses.
   - Child care expenses.
   - Pet care expenses.
   - Gifts and donations.
   - Movie and mini-bar expenses except water.
   - Fitness center fees.
   - Purchase of equipment (including computer peripherals or computer software).

3. Mileage and fuel charges: Consultants and speakers are reimbursed for all auto mileage driven on Genzyme business at the rate set by the IRS for the month/year the travel occurred. Alternately, Genzyme may reimburse for fuel costs, but in no case both mileage

reimbursement AND fuel charges. Rental car fuel charges are reimbursable. Pre-paid rental car fuel charges and additional fuel charges are reimbursable provided the demands of the business trip required use of more than one tank of fuel.

4. Meals and Entertainment: Meals are only reimbursable by Genzyme if it is "directly related to" or "associated with" the active conduct of Genzyme business. Genzyme will reimburse the following:

   • The reasonable cost of meals incurred when on a business trip which takes the consultant or speaker away from home overnight.

   • When business travel delays the consultant or speaker beyond the usual dinner hour. Only personal meals are reimbursable. The per diem expense for a traveling consultant or speaker eating alone is $60 per day to include breakfast, lunch, dinner and snacks. Entertainment of non-contracted persons is not reimbursable to consultants and speakers or speakers.

5. Hotel Expenses: Hotel expenses must be itemized for reimbursement. You will be required to break out hotel expenses based on number of nights, hotel taxes, and ancillary charges (e.g., telephone, room service, parking, etc.).

6. Communication fees (telephone, cell phone, internet connections) All communications fees submitted for reimbursement require an itemized receipt/invoice detailing the service rendered including, but not limited to, carrier fees, itemized phone calls and/or minutes used, equipment fees, etc.

7. Tips: Genzyme will provide reimbursement for individual tips (e.g., valet, housekeeping in a hotel, hotel concierge) while on business travel. Please note that these tips should be reasonable and commensurate with the service provided.

8. Tolls: Genzyme will provide reimbursement for tolls incurred while traveling on Genzyme business.

9. Parking: Genzyme will provide reimbursement for parking fees incurred while traveling on Genzyme business. The dates for parking must match the dates listed for travel.

10. Airfare and Related Fees: Genzyme will provide reimbursement for airfare and airfare change fees incurred while traveling on Genzyme business. All airfare must be purchased in accordance with Travel Policy requirements stated within this policy.

11. Exchange Rate Fee: Genzyme will provide reimbursement of fees related to the exchange of currency while traveling on Genzyme business.

12. Rental Car Fees: Genzyme will provide reimbursement of rental car charges and related fuel expenses incurred while traveling on Genzyme business.

13. Taxi: Genzyme will provide reimbursement of cab fare incurred while traveling on Genzyme business.

14. Rail Charges: Genzyme will provide reimbursement of train, subway, or public transportation charges incurred while traveling on Genzyme business.

A-3

15. Limousine/Car Service Charges: Genzyme will provide reimbursement of cab fare incurred while traveling on Genzyme business. Limousine or car services may be used when it is the most economical means for transportation or when the distance to your home and from the airport is 20 miles or more AND taxi service is not available.

16. Copy Services Genzyme will provide reimbursement of copy expenses directly related to Genzyme business. In addition to providing a receipt as defined with the Receipt section of this policy, please provide a detailed description of the materials copied within the expense report on which the expense is listed.

17. Postage: Genzyme will provide reimbursement of postage directly related to Genzyme business. In addition to providing a receipt as defined with the Receipt section of this policy, please provide a detailed description of the purchase including, if applicable, package content and recipient, within the expense report on which the expense is listed.

18. Audit Policy: Genzyme performs random audits on all expense reports. Please note that expense reports are also audited by our external auditors as part of standard, regulated financial audits or by the Internal Revenue Service as part of corporate tax audits. If there are questions with a submitted expense report, please be prepared to provide requested information in a timely manner



**HAMMOCK BEACH**
**RESORT**
PALM COAST FLORIDA

200 Ocean Crest Drive • Palm Coast, Florida 32137
Phone: 386-246-5500 • Facsimile: 386-246-5600 • Reservations: 888-246-5500

Kelley, Dr Scott
1005 Bayshore Blvd.
Tampa, FL  33606

| | |
|---|---|
| FOLIO NO.: | 20D04A |
| ROOM NO.: | T0518   CLERK:   SM |
| ARRIVE: | 05/22/09 |
| DEPART: | 05/24/09 |
| RATE/PACKAGE: | 309.00 |
| RATE/PACKAGE DESCRIPTION: | FCACV3 |
| NO. IN PARTY: | 3 |
| DEPOSIT REC'D: | 373.05 |

| DATE | | | | DESCRIPTION | | CHARGES | PAYMENTS |
|---|---|---|---|---|---|---|---|
| 05/18/09 | 20D04A | H0AMEX | 1 | XXXXXXXXXXX3024 | JF | | 373.05 |
| 05/22/09 | 20D04A | POS070 | 1 | OH Atl Grille #9458 | IF | 15.41 | |
| 05/22/09 | 20D04A | POS070 | 1 | OH Atl Grille #9455 | IF | 26.97 | |
| 05/22/09 | 20D04A | POS052 | 1 | HB Loggerheads #4764 | IF | 32.75 | |
| 05/22/09 | 20D04A | POS058 | 1 | HB RM Serv #5831 | IF | 59.92 | |
| 05/22/09 | 20D04A | POS054 | 1 | HB Sushi Bar #5716 | IF | 91.19 | |
| 05/22/09 | 20D04A | POS054 | 1 | HB Sushi Bar #5720 | IF | 91.19 | |
| 05/22/09 | 20D04A | POS052 | 1 | HB Loggerheads #4776 | IF | 22.47 | |
| 05/22/09 | 20D04A | H1PAKG | 1 | FL Chp ACS - 3villa | -- | 309.00 | |
| 05/22/09 | 20D04A | H0SVCH | 1 | Service Charge | -- | 33.15 | |
| 05/22/09 | 20D04A | H0STAX | 1 | STATE SALES TAX | -- | 21.63 | |
| 05/22/09 | 20D04A | H0OTAX | 1 | Occupancy Tax | -- | 9.27 | |
| 05/23/09 | 20D04A | POS070 | 1 | OH Atl Grille #9489 | IF | 57.59 | |
| 05/23/09 | 20D04A | POS070 | 1 | OH Atl Grille #9497 | IF | 33.26 | |
| 05/23/09 | 20D04A | POS059 | 1 | HB Coffee Bar #1725 | IF | 3.04 | |
| 05/23/09 | 20D04A | POS057 | 1 | HB Ocean Bar #5581 | IF | 18.62 | |
| 05/23/09 | 20D04A | POS052 | 1 | HB Loggerheads #4836 | IF | 60.15 | |
| 05/23/09 | 20D04A | H1PAKG | 1 | FL Chp ACS - 3villa | -- | 309.00 | |
| 05/23/09 | 20D04A | H0SVCH | 1 | Service Charge | -- | 33.15 | |
| 05/23/09 | 20D04A | H0STAX | 1 | STATE SALES TAX | -- | 21.63 | |
| 05/23/09 | 20D04A | H0OTAX | 1 | Occupancy Tax | -- | 9.27 | |

Subtotals    $    1258.66    373.05

BALANCE DUE    $    885.61

**CHARGES NOT POSTED AT CHECKOUT WILL BE CHARGED TO YOUR CREDIT CARD ACCOUNT OR WILL BE BILLED TO YOU DIRECTLY.**
I agree that the liability for any charges not posted to this bill at time of check out is not waived and I agree to be held personally liable in the event that the indicated person, company, or association fails to pay for any, or the full amount of charges. I also agree that any disputes of charges contained in this account must be made within two days after departure.
All unpaid amounts are due upon presentation of this bill. Failure to pay for 30 days after the due date will result in a past due balance and the imposition of a Finance Charge. The Finance Charge will be applied to the past due balance and will be computed at the rate of 1 3/4% per month for an Annual Percentage Rate of 21%. All payments and credits are deducted from the past due balance prior to the computation of the Finance Charge. The Advance Deposit is applied to the last night of your stay. In the event of check out earlier than scheduled, one night's published room rate is non-refundable.

Guest Signature X _____     Date _____
               I agree to be personally liable for all valid charges on this bill.



# Registration Receipt

**TO:**     Scott T. Kelley, M.D.

**Fax:**

**FROM:**     Joy Harvey , FCACS Registration Coordinator

**FAX #:**     (904) 637-0937          **PHONE #:**     (904) 637-0944

**DATE:**     March 31, 2009          **PAGES:**     1, including this cover

**RE:**     2009 Annual Meeting of the Florida Chapter American College of Surgeons

| Functions | Number Attending | Cost | |
|---|---|---|---|
| Meeting Registration Fee | 1 | $350.00 | $350.00 |
| Additional Guest (spouse/children) | | Incl. | |
| Attendees Lunch – Disaster Management Meeting, Thursday, 5/21/09 | 1 | Incl. | |
| Attendees Lunch – ACS Coding Seminar, Thursday, 5/21/09 | 1 | Incl. | |
| Lunch, attendees and families, Friday, 5/22/09, 11:45 – 1:30 p.m. | 1 | Incl. | |
| Lunch, attendees and families, Saturday, 5/23/09, 12:30 – 1:30 p.m. | 1 | Incl. | |
| Golf Tournament, Saturday, 5/23/09 | 0 | | |
| Tennis Tournament, Saturday, 5/23/09 | 0 | | |
| President's Reception and Dance Saturday, 5/23/09, 6:30 – 11:00 p.m. | 0 | Incl. | |
| Seated Breakfast (Surgeons Only) Sunday, 5/24/09, 8:00 – 8:45 a.m. | 1 | Incl. | |
| | | | |
| **TOTAL CHARGE** | | **Method Of Payment: AMEX** | $350.00 |
| | | | |

1. World J Surg. 2007 Nov;31(11):2125-31; discussion 2132.

# Efficacy and safety of Seprafilm for preventing postoperative abdominal adhesion: systematic review and meta-analysis.

Zeng Q, Yu Z, You J, Zhang Q.

Department of General Surgery, the First Affiliated Hospital, Wenzhou Medical College, Wenzhou 325003 Zhejiang Province, China.
mailto:zengqiqiangwz@163.comzengqiqiangwz@163.com.

Comment in:

- World J Surg. 2008 Aug;32(8):1883-4; author reply 1885.

- World J Surg. 2008 Aug;32(8):1888-9; author reply 1890-1.

- World J Surg. 2008 Aug;32(8):1886-7; author reply 1890-1.

BACKGROUND: There is no clear consensus on the efficacy and safety of hyaluronate-carboxymethylcellulose membrane (Seprafilm) for preventing postoperative abdominal adhesion. This study is a meta-analysis of the available evidence. METHODS: A search of the MEDLINE, EMBASE, and the Cochrane Library identified eight studies that met the inclusion criteria for data extraction. Estimates of effectiveness were performed using fixed- and random-effects models. The effect was calculated as an odds ratio (OR) with 95% confidence intervals (CI) using the statistical software Review Manager Version 4.2. Level of significance was set at $p < 0.05$. RESULTS: Outcomes of 4203 patients were studied. The incidence of grade 0 adhesions among Seprafilm-treated patients was statistically significantly more than that observed among control group patients (OR 95%CI, 3.74-20.34; $p < 0.01$). There was no significant difference in the incidence of grade 1 adhesions between Seprafilm and control groups (OR 95%CI, 0.58-2.71; $p = 0.56$). The severity of grade 2 and grade 3 adhesions among Seprafilm-treated patients was significantly less than that observed among control group patients (OR 95%CI, 0.22-0.93; $p = 0.03$; OR 95%CI, 0.09-0.63; $p < 0.01$, respectively). The incidence of intestinal obstruction after abdominal surgery was not different between Seprafilm and control groups (OR 95%CI, 0.78-1.23; $p = 0.84$). Using Seprafilm significantly increased the incidence of abdominal abscesses (OR 95%CI, 1.06-2.54; $p = 0.03$) and anastomotic leaks (OR 95%CI, 1.18-3.50; $p = 0.01$). CONCLUSIONS: Our systematic review and meta-analysis showed that Seprafilm could decrease abdominal adhesions after general surgery, which may benefit patients, but could not reduce postoperative intestinal obstruction. At the same time, Seprafilm did increase abdominal abscesses and anastomotic leaks.

PMID: 17899250 [PubMed - indexed for MEDLINE]





## Publication Types:

- Meta-Analysis
- Review

## MeSH Terms:

- Abscess/epidemiology
- Humans
- Hyaluronic Acid/therapeutic use*
- Membranes, Artificial*
- Postoperative Complications/epidemiology
- Postoperative Complications/prevention & control*
- Randomized Controlled Trials as Topic
- Tissue Adhesions/prevention & control
- Treatment Outcome

## Substances:

- Membranes, Artificial
- Seprafilm
- Hyaluronic Acid

Item 1 of 1

1. Gynecol Oncol. 2009 Nov;115(2):204-8. Epub 2009 Sep 8.

# Postoperative intra-abdominal collections using a sodium hyaluronate-carboxymethylcellulose (HA-CMC) barrier at the time of laparotomy for ovarian, fallopian tube, or primary peritoneal cancers.

Leitao MM Jr, Natenzon A, Abu-Rustum NR, Chi DS, Sonoda Y, Levine DA, Gardner GJ, Barakat RR.

Division of Gynecology, Department of Surgery, Memorial Sloan-Kettering Cancer Center, 1275 York Avenue, New York, NY 10065, USA.
mailto:gynbreast@mskcc.orgmailto:gynbreast@mskcc.orggynbreast@mskcc.org

OBJECTIVES: To determine whether HA-CMC was associated with the development of postoperative intra-abdominal collections in patients undergoing laparotomy for ovarian, fallopian tube, or primary peritoneal malignancies. METHODS: We retrospectively identified all laparotomies performed for these malignancies from March 1, 2005 to December 31, 2007. The use of HA-CMC was identified. Laparotomies for malignant bowel obstruction or repair of fistulae were excluded. Intra-abdominal collections, non-infected and infected, were defined as localized intraperitoneal fluid accumulations in the absence of re-accumulating ascites. All other complications were also captured. Appropriate statistical tests were applied using SPSS 15.0. RESULTS: We identified 219 laparotomies with HA-CMC and 204 without HA-CMC. Upper abdominal resections were performed in 65/219 (30%) HA-CMC cases compared to 39/204 (19%) cases without HA-CMC (P=0.01). The rates of large bowel and/or rectal resections were similar in both cohorts. Intra-abdominal collections were seen in 18/219 (8.2%) HA-CMC cases compared to 5/204 (2.5%) cases without HA-CMC (P=0.009). HA-CMC was independently associated with the diagnosis of a postoperative intra-abdominal collection (P=0.01). All but 2 collections developed in patients undergoing debulking procedures. CONCLUSIONS: HA-CMC appears to be associated with a higher rate of postoperative intra-abdominal collections. This seems to be greatest in patients who are undergoing a debulking procedure.

PMID: 19740532 [PubMed - indexed for MEDLINE]

ELSEVIER
FULL-TEXT ARTICLE

**MeSH Terms:**



- Adolescent
- Adult
- Aged
- Aged, 80 and over
- Ascites/pathology*
- Carboxymethylcellulose/administration & dosage*
- Carboxymethylcellulose/adverse effects
- Cohort Studies
- Fallopian Tube Neoplasms/pathology
- Fallopian Tube Neoplasms/surgery*
- Female
- Humans
- Hyaluronic Acid/administration & dosage*
- Hyaluronic Acid/adverse effects
- Laparotomy/adverse effects
- Laparotomy/methods
- Membranes, Artificial
- Middle Aged
- Ovarian Neoplasms/pathology
- Ovarian Neoplasms/surgery*
- Peritoneal Neoplasms/pathology
- Peritoneal Neoplasms/surgery*
- Retrospective Studies
- Tissue Adhesions/prevention & control
- Young Adult

## Substances:

- Membranes, Artificial

- **Seprafilm**
- **Carboxymethylcellulose**
- **Hyaluronic Acid**



**Genzyme Biosurgery**
55 Cambridge Parkway
Cambridge MA 02142
617 494 8484

April 29, 2009

Dr. Scott T. Kelley
1005 Bayshore Blvd
Tampa, FL 33606

Dear Dr. Kelley:

On behalf of Genzyme Biosurgery's Biosurgical Specialties business unit, we would like to thank you for speaking at The Seprafilm presentation which took place on April 28th.

Enclosed is your fee in the amount of $1,000.00 and reimbursement for any expenses incurred in performing the speaking services for which appropriate documentation has been submitted. If you have not yet sent this information, please do so as soon as possible. Should you have any further questions, please contact me at (617) 591-5919.

Kind regards,

Valery Osias
Trade Show Event Specialist
Genzyme Biosurgery

cc: Joe Fuentes



genzyme

| Voucher | Invoice | Gross Amount | Discount | Net Amount |
|---|---|---|---|---|
| 1497534 | Honorarium | 1,000.00 | 0.00 | 1,000.00 |
| 042809 | | 1,000.00 | 0.00 | 1,000.00 |

0009345 SCOTT T KELLEY

CHECK NO 046710